# Richmond

## W. Frank Smyth, Jr., Superintendent of the Virginia State Penitentiary v. Charles M. Godwin.

January 10, 1949.

Record No. 3473.

Present, All the Justices.

J. *Lindsay Almond, Jr., Attorney General,* and *Ballard Baker, Special Assistant to Attorney General,* for the plaintiff in error.

*A. Clair Sager,* for the defendant in error.

EGGLESTON, J., delivered the opinion of the court.

At the August, 1944, term of the Corporation Court of the city of Norfolk, Part Two, Charles M. Godwin, hereinafter called the petitioner, was indicted for rape of Clara Mae Stowe, a female under the age of sixteen years. He was tried by a jury which found him guilty and fixed his punishment at confinement in the penitentiary for twenty years. In due time judgment was entered on the verdict, to which we denied a writ of error on November 15, 1944 (183 Va. lxi), and he was committed to the State Penitentiary.

On May 11, 1948, the petitioner filed in the Hustings Court of the city of Richmond, Part II, a petition for a writ of *habeas corpus* against W. Frank Smyth, Jr., Superintendent of the Virginia State Penitentiary, praying for his release from custody of the respondent, on the ground that his conviction was void for lack of due process of law in his trial. Upon a hearing the Hustings Court of the city of Richmond, Part II, sustained the contention of the petitioner that his conviction was void, ordered that he be released from the custody of the respondent, and that he be remanded to the custody of the sergeant of the city of Norfolk for such action as the Commonwealth might be advised. To review this order the present writ of error has been allowed the respondent.

At the outset we are met with the contention of the petitioner that under section 88 of the Constitution, which defines the jurisdiction of this court, a writ of error does not lie at the instance of the Commonwealth to review the order or judgment complained of.

This section of the Constitution, after defining the original jurisdiction of the court, provides:

"Subject to such reasonable rules as may be prescribed by law as to the course of appeals, the limitation as to the time, the value, amount or subject matter involved, * * *

it shall, by virtue of this Constitution, have appellate juris-diction in cases involving the constitutionality of a law as being repugnant to the Constitution of this State or of the United States, or *involving the life or liberty of any person;* and in such other cases as may be prescribed by law. *No appeal shall be allowed to the Commonwealth in a case involving the life or liberty of a person, except that an appeal by the Commonwealth may be allowed in any case involving the violation of a law relating to the State revenue.*"[1] (Emphasis added.)

It is argued that a *habeas corpus* proceeding, such as this, involves the "liberty" of the petitioner; that while the Commonwealth is not technically a party to the proceeding, it is in substance a party, and that hence the allowance of the writ of error or appeal is in violation of the constitutional provision.

In reply the Attorney General insists that the Common-wealth is not, and has never been, a party to the *habeas corpus* proceeding; that as required by the statute (Code, sec. 5849), the writ was directed to the respondent, W. Frank Smyth, Jr., "as the individual who was detaining the then petitioner;" that the order complained of concerned him alone; and that the writ of error was "allowed to" him and not to the Commonwealth. Hence, it is said, the allowance of the writ is not within the constitutional pro-visions relied on.

We cannot agree with this latter contention. While it is true that the Commonwealth is not a named party in the *habeas corpus* proceeding, it is, of course, vitally inter-ested in it. The purpose of the proceeding is to test the validity of the detention of the petitioner by an agent of the State government in the discharge of his official duty.

In *Sayers* v. *Bullar*, 180 Va. 222, 22 S. E. (2d) 9, we held that an action against an agent of the Commonwealth to

---

[1] While there is a wealth of authority on the general subject of the right of the State to appeal in criminal and *habeas corpus* cases, we have been able to find no case involving a constitutional or statutory limitation on the right of appeal similar to that above.

recover damages for a tort alleged to have been committed by him while acting legally and within the scope of his employment, was an action against the State. See also, *Wilson* v. *State Highway Com'r*, 174 Va. 82, 4 S. E. (2d) 746; 49 Am. Jur., States, sec. 92, pp. 304, 305.

Under the same principle the *habeas corpus* proceeding here was, in effect, a proceeding against the Commonwealth which was the real party in interest. It necessarily follows, then, that the application for the writ of error was in substance by the Commonwealth which is the real party in interest.

██ But we agree with the argument of the Attorney General that the constitutional provision was designed to preclude the allowance of an appeal or writ of error to the Commonwealth in a criminal prosecution "involving the life or liberty of a person," other than a prosecution for the "violation of a law relating to the State revenue," and was not intended to apply to a *habeas corpus* or other civil proceeding.

It is well settled that *habeas corpus* is a civil and not a criminal proceeding. It is designed to challenge the civil right of the validity of the petitioner's detention. It is in no sense a continuation of the criminal prosecution.

As was said in *Ex parte Tom Tong*, 108 U. S. 556, 559, 560, 2 S. Ct. 871, 27 L. Ed. 826, *habeas corpus* "is a new suit brought by him (petitioner) to enforce a civil right, which he claims, as against those who are holding him in custody, under the criminal process." See also, *Cross* v. *Burke*, 146 U. S. 82, 88, 13 S. Ct. 22, 36 L. Ed. 896; 25 Am. Jur., Habeas Corpus, sec. 12, p. 151; 39 C. J. S., Habeas Corpus, sec. 108, p. 705.

While the language used in section 88 does not in terms limit the denial of an appeal to the Commonwealth in a criminal prosecution, such, we think, was its purpose.

██ It is true that in a sense the present *habeas corpus* proceeding involves the "liberty" of the petitioner. By reason of his membership in society a person's liberty is much restricted. Consequently, the enforcement of many

civil laws involve his liberty. For instance, when the State, or one of its political subdivisions, takes his property in a condemnation proceeding for public use, his liberty or right of ownership of the property is interfered with. Yet no one would contend that the Commonwealth or a municipality was denied the right of appeal because such a proceeding involved the liberty of the property owner.

The word "liberty" as used in this section of the Constitution must, of course, be interpreted in the light of its context. Ordinarily, "a case involving the life or liberty of a person" connotes a criminal prosecution, a proceeding in which the conviction of an accused may result in a sentence of death or imprisonment, that is, a judgment directly depriving him of his life or liberty. Certainly, a case involving the "life" of a person denotes a criminal prosecution. An adverse judgment in a *habeas corpus* proceeding, brought to test the validity of a sentence of death under which a prisoner is held, does not deprive him of his life. It involves the validity of the judgment which may result in his death, but the criminal prosecution was the proceeding which directly involved his life. Since the two words are here used co-ordinately, why should a broader meaning be attributed to "liberty" than to "life?"

When we examine the historical origin of the lanuage under consideration it becomes even clearer, we think, that it was designed to apply to a criminal and not to a civil proceeding.

This constitutional provision with respect to the right of appeal on behalf of the Commonwealth first appeared in the Constitution of 1902, and was incorporated in section 8 of the Bill of Rights. The pertinent portion of this section, which bears the title "Concerning criminal prosecutions generally," as reported by the Committee on Preamble and Bill of Rights, read thus:

"8. That, in all capital or criminal prosecutions, a man hath a right to demand the cause and nature of his accusation; to be confronted with the accusers and witnesses; to call for evidence in his favor, and to a speedy trial by an

impartial jury of his vicinage, without whose unanimous consent he cannot be found guilty; *nor shall any person be twice put in jeopardy for the same offense;* nor can he be compelled to give evidence against himself; that no man be deprived of his liberty, except by the law of the land or the judgment of his peers; * * *."[2]   (Italics supplied.)

As Mr. Green, the Chairman of the Committee, pointed out, the italicized jeopardy provision had not previously been written into the fundamental law of the State, although its principle as a part of the common law had theretofore been relied upon and respected by the courts.[3]

On motion of Mr. Hunton, the italicized phrase was amended to read thus: "nor shall any person be put twice in jeopardy for the same offense, except that an appeal may be allowed to the Commonwealth in all cases for the violation of a law relating to the State revenue."[4]

In support of the amendment Mr. Hunton, who was Chairman of the Committee on the Judiciary, which drafted section 88 of the Constitution dealing with the composition and jurisdiction of the Supreme Court of Appeals, and later adopted by the Convention, said:   "My object in offering the amendment is to preserve to the Commonwealth of Virginia a right of appeal in all *criminal cases* where the revenues of the State are involved."[5]   (Emphasis added.)

He further pointed out that the amendment would preserve the right of appeal to the Commonwealth in criminal cases, as embodied in section 4052 of the Code of 1887 (sec. 4931, Michie's Code of 1942).[6]

■ The purpose of the amendment, then, was not to limit the right of appeal by the Commonwealth, but to preserve to it a right which otherwise would have been lost.

[2] Debates of the Constitutional Convention, p. 93.

[3] Debates of the Constitutional Convention, p. 102.   See also, 6 Va. Law Reg. 243, article by M. P. Burks; *Commonwealth v. Perrow,* 124 Va. 805, 809, 97 S. E. 820.

[4] Amendment offered, Debates of the Constitutional Convention, p. 393. Amendment agreed to, Debates of the Constitutional Convention, p. 396.

[5] Debates of the Constitutional Convention, p. 394.

[6] Debates of the Constitutional Convention, p. 394.

Section 88, as adopted by the Convention, after defining the appellate jurisdiction of the court, provided that: "No appeal shall be allowed to the Commonwealth in a case involving the life or liberty of a person, except that an appeal by the Commonwealth may be allowed in any case involving the violation of a law relating to the State revenue."

Thus the denial of the right of appeal to the Commonwealth embodied in section 8 of the Bill of Rights, relating to criminal prosecutions, was in almost identical language embodied in that portion of section 88 which defined the appellate jurisdiction of the court.

The debate which took place on the floor of the Convention on the proposal and adoption of section 88, likewise shows that the inhibition against the allowance of an appeal to the Commonwealth was intended to apply to criminal prosecutions. For instance, Mr. Eggleston, a member of the Committee on the Judiciary, in arguing that the appellate jurisdiction of the court should not be fixed in the Constitution but should be left to the determination of the General Assembly, said: "The principle of common law which provides that no man shall twice be put in jeopardy for the same offense, has been inviolate in this State from time immemorial. It has never before been found necessary to put it in a Constitution; and yet *we find here a provision which absolutely forbids this Commonwealth from taking appeals in any criminal case, except in matters involving revenue.*"[7] (Emphasis added.)

Continuing, the same speaker pointed out why he thought it would be advisable to permit the General Assembly to give the Commonwealth a right of appeal in certain *criminal prosecutions* other than those involving the State revenues.[8]

It is clear, we think, that the provision prohibiting the allowance of an appeal to the Commonwealth in a case "involving the life or liberty of a person" was inserted in the Constitution to insure that in a criminal prosecution,

[7] Debates of the Constitutional Convention, p. 1632.
[8] Debates of the Constitutional Convention, p. 1632.

where a man's guilt or innocence of the charge made against him is at issue, he may not "be put twice in jeopardy for the same offense." It was first written into section 8 of the Bill of Rights dealing with criminal prosecutions, and was later carried into section 88 defining the appellate jurisdiction of the State's highest court. But its purpose in both sections is the same.

In 1928 both sections 8 and 88 were amended and reduced to their present form. In section 8 the provision that in criminal prosecutions no man shall "be put twice in jeopardy for the same offense" was retained, but the language immediately following, denying the right of appeal to the Commonwealth except in revenue cases was omitted.

With respect to this change the Report of the Commission to suggest amendments to the Constitution said: "The omission of the sentence allowing an appeal by the Commonwealth in revenue cases, * * * is to avoid duplication, as such a right is granted under the Article defining the jurisdiction of the Supreme Court of Appeals. That is obviously the proper place for it."[9]

It will be observed that the report does not mention the omission from this section of the *denial* of the right of appeal to the Commonwealth. It merely points out that the *allowance* of an appeal to it "in revenue cases," that is, in criminal prosecutions involving the violation of the State revenue laws, is preserved in section 88.

There is no suggestion that the elimination from section 8 of the prohibition against the allowance of an appeal to the Commonwealth, and its retention in section 88, was designed to change the purpose for which it was originally incorporated in both sections. This purpose, as we have seen, was to insure that no man "be put twice in jeopardy" for an alleged criminal offense.

No question of former jeopardy is involved in this proceeding. The Commonwealth is not appealing from a judgment in the criminal prosecution. A reversal of the judg-.

---

[9] House Journal and Documents, House Document No. 2, 1927 Ex. Sess., p. 17.

ment directing the discharge of the petitioner will in no way subject him to being twice put in jeopardy for the same offense. Compare *Roanoke* v. *Donckers*, 187 Va. 491, 493, 47 S. E. (2d) 440, 441.

The General Assembly has acquiesced in the view that the constitutional provision under consideration does not prohibit the allowance of an appeal to the Commonwealth in a *habeas corpus* proceeding.

Code, sec. 6336, provides for the filing of a petition for an appeal or writ of error by "any person who thinks himself aggrieved by * * * a final judgment, decree, or order in any civil case, * * *."

The respondent, as the superintendent of the penitentiary, is a "person" who is "aggrieved" by the order or judgment complained of. 39 C. J. S., Habeas Corpus, sec. 109-c, p. 711.

Moreover, Code, sec. 5859, provides: "When the prisoner is remanded, the execution of the judgment shall not be suspended by a writ of error, or for the purpose of applying for such writ; but where he is ordered to be discharged, and the execution of the judgment is suspended for the purpose of applying for a writ of error, the court or judge making such suspending order, may, in its or his discretion, admit the prisoner to bail until the expiration of the time allowed for applying for the writ of error, or, in case the writ of error be allowed, until the decision of the Supreme Court of Appeals thereon is duly certified."

Clearly this section contemplates that the Commonwealth, or its proper agent, may apply for a writ of error to a judgment directing the discharge of a prisoner.

While the origin of this statute antedates[10] the adoption of the constitutional provision under review, it is significant that the revisers of the Code of 1919 suggested no change in the statute so as to preclude an appeal by or on behalf of the Commonwealth in conformity with the view of the petitioner. Nor has the General Assembly, on its own initiative, made such a change.

[10] See Code of 1887, section 3040; Code of 1849, p. 614, section 12.

In *Commonwealth* v. *Beavers*, 150 Va. 33, 142 S. E. 402, this court, in 1928, on the petition of the Commonwealth and the superintendent of the penitentiary, granted a writ of error to, and reversed, an order of the Circuit Court of Page county discharging the petitioner in a *habeas corpus* proceeding. While neither the opinion nor the briefs discussed the subject, we are satisfied, as the court then must have been, that it had jurisdiction to grant the writ of error and to dispose of the matter.

Accordingly, we sustain the jurisdiction of this court in the present proceeding.

We turn, then, to the merits. In the petition for the writ of *habeas corpus* it is alleged that the petitioner's trial in the Corporation Court of the city of Norfolk, Part Two, was wanting in the required due process of law in four respects:

(1) His representation by counsel was "grossly incompetent;"

(2) Because of the "unannounced shifting of the trial date by the court" he was "deprived of the availability of witnesses in his behalf;"

(3) Over his protest he was sentenced in the absence of his counsel; and

(4) "He was convicted * * * on perjured testimony of witnesses for the Commonwealth." There was no allegation that the prosecuting officers or other agencies of the Commonwealth knew that the testimony of these witnesses was false or perjured.

The evidence adduced before the trial court in the *habeas corpus* proceeding consisted of a transcript of the testimony heard at the preliminary trial in the Juvenile and Domestic Relations Court of the city of Norfolk; a transcript of the testimony and other proceedings at the trial in the Corporation Court of the city of Norfolk, Part Two; certain affidavits and exhibits; the oral testimony of the petitioner; that of A. A. Bangel, the attorney who represented him at the trial in the Corporation Court and who presented to the appellate court the petition for a writ of

error; that of C. J. Staylor, a member of the Norfolk city police force; and that of Hon. J. Hume Taylor, who, as Commonwealth's attorney conducted the prosecution in the Corporation Court and has since been elected judge of that court to succeed Hon. James U. Goode, now deceased, who presided at the trial.

Upon this evidence the Hustings Court of the city of Richmond, Part II, found, as stated in its written opinion, that the petitioner's conviction in the Corporation Court was void, on the ground that it rested upon perjured testimony which "the servants of the Commonwealth" knew, "prior to its use," was false. The gist of the trial court's holding is thus stated in its opinion:

"The Commonwealth's attorney who used this testimony in the Corporation Court did not participate in the preliminary hearing and there is no evidence to show that he had knowledge of what transpired at that hearing or that he had any reason to believe the prosecutrix was lying in the Corporation Court. He is therefore personally exonerated from any miscarriage of justice that may have resulted. There is no claim that the court itself knew of the perjury.

"The fact remains, however, that the Commonwealth through some of its agencies and administrative officials or servants, did know, and therefore the Commonwealth is chargeable with knowingly having used perjured testimony on which this conviction rests."

The lower court did not identify the "agencies and administrative officials or servants" of the Commonwealth referred to, but nevertheless held that the case came within the purview of *Mooney* v. *Holohan*, 294 U. S. 103, 55 S. Ct. 340, 79 L. Ed. 791, 98 A. L. R. 406, and that the petitioner should be discharged.

It found against the petitioner's contentions that his conviction was void because of the alleged gross incompetence of his counsel,[11] and because of the "shifting of the date of

---

[11] The uncontradicted evidence is that his counsel, Mr. Bangel, a member of the Portsmouth Bar, is a "competent, experienced and able attorney." He was employed by petitioner's father.

trial." It did not pass upon the further contention that the sentence of the petitioner in the absence of his counsel was void.

Inasmuch as there are no assignments of cross-error as to these matters, and since they are not pressed before us, we need not discuss them further except in so far as they relate to the main question presented to us.

In the *Mooney Case* the Supreme Court held that a conviction was wanting in the requirement of due process "if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured." (294 U. S., at page 112.)

As we pointed out in *Penn* v. *Smyth*, *ante*, pp. 367, 375, 49 S. E. (2d) 600, 603, under the holding in the *Mooney Case* "even if the conviction could be said to have been founded on the false testimony" of witnesses, "this alone is insufficient to render void the judgment of conviction. Such a result could follow only if it appeared that the State prosecuting officers knowingly resorted to perjured testimony to bring about petitioner's conviction." See also, *Casebeer* v. *Hudspeth*, C. C. A. 10, 121 F. (2d) 914, 915, 916.[12]

The evidence adduced on behalf of the Commonwealth at the trial in the Corporation Court shows that on the afternoon of Sunday, September 12, 1943, Clara Mae Stowe, a thirteen year old girl, residing with her parents and family in Norview, Norfolk county, went with her mother to visit relatives on Brambleton avenue, in the city of Norfolk. During this visit Clara disappeared. She went to the Ocean View section of the city where with a girl companion she attended a dance which ended at midnight. While considering whether she would return home, she was accosted by the petitioner who identified himself as the man "Charlie" who had earlier in the evening sent her a $10 bill by a

[12] Certiorari denied, 316 U. S. 683, 62 S. Ct. 1272, 86 L. Ed. 1755; rehearing denied, 317 U. S. 704, 63 S. Ct. 23, 87 L. Ed. 562.

small boy. Godwin invited her to spend the night at his near-by apartment, and she accepted the invitation.

She described the apartment as consisting of a dining room, a kitchenette and a bedroom in which there was a double bed. Her description of the premises was corroborated by the testimony of the owner, who likewise testified that at that time it was occupied solely by Godwin.

Shortly after her arrival at the apartment the girl removed all of her clothes, excepting her underclothes, and went to sleep in the double bed. During the night she was awakened from her deep sleep and found that Godwin was in the bed with her. She said that he then and there had sexual intercourse with her.

Godwin left the apartment before she arose on Monday morning and did not return until after dark. She spent Monday night in the apartment with Godwin, but did not testify as to any improper relations with him. At no time during either night while she and Godwin were together in the apartment were the lights turned on. Despite a rigid cross-examination as to the correctness of her identification, she clearly and positively pointed to Godwin as the guilty person.

The girl remained at the apartment until Tuesday night, September 14, when, at Godwin's suggestion, she took the boat for Baltimore, using the $10 which he had previously given her to purchase a ticket. She procured work in Baltimore and remained there until the following June when she returned home. On the objection of petitioner's counsel, evidence which tended to show that during her stay at Baltimore she was visited by Godwin was excluded from the jury.

At the trial in the Corporation Court Godwin did not testify, nor was any evidence adduced in his behalf.

At the hearing in the *habeas corpus* proceeding Mr. Bangel testified that he had previously represented the petitioner at a trial on an indictment in the Circuit Court of Norfolk county, wherein the petitioner was charged with having kidnapped this girl, and that "because of his knowl-

edge of the background, he advised Godwin not to take the stand at the trial" in the Corporation Court.

The opinion of the lower court holds that the testimony of the prosecutrix in the Corporation Court, upon which the petitioner was convicted, was false and perjured with respect to two material matters:

First, it is held that she testified falsely when she said that Godwin had sexual intercourse with her during the first night which she spent at his apartment.

The sole basis for this holding is that this testimony is at variance with that given by her at the preliminary hearing before the Juvenile and Domestic Relations Court. The transcript of that proceeding shows that the prosecutrix testified that when she awoke the petitioner was attempting to have intercourse with her, that the act was not consummated, and that upon her resistance he discontinued the attack.

There was no oral testimony on the subject adduced before the trial court in the *habeas corpus* proceeding. It merely had before it the transcript of the testimony of this witness at the two proceedings. While the two statements are at variance, there is nothing in the record to show which is true and which is false.

As is said in 41 Am. Jur., Perjury, sec. 66, p. 36, "A conviction for perjury cannot be sustained merely on the contradictory sworn statements of the defendant, but the state must prove which of the two statements is false, and must show that statement to be false by other evidence than the contradictory statement." See also, *Schwartz* v. *Commonwealth*, 27 Gratt. (68 Va.) 1025, 1028, 1029, 21 Am. Rep. 365. The same principle applies here.

Moreover, assuming that this testimony of the girl was false, there is not a scintilla of evidence in the record that the Commonwealth's attorney, or any other official or servant of the State, knew that it was false. Indeed, the uncontradicted testimony is that neither the Commonwealth's attorney nor any of his assistants attended the preliminary hearing. There is no evidence that these officials even

knew that the testimony given by the prosecutrix at the trial in the Corporation Court was at variance with that given by her at the preliminary hearing. But even if they knew of her testimony at the preliminary hearing it is reasonable to assume that they learned that the girl had not then disclosed the true facts. Certainly her later recital is much more apt to be true than the earlier one.

Next, the trial court held that the prosecutrix testified falsely before the Corporation Court when she fixed the date of the offense as the night of September 12, whereas she had testified at the preliminary hearing that it occurred on the night of September 7.

Here, too, there was no oral testimony presented in the *habeas·corpus* proceeding with respect to which of the two dates is correct, and hence we are confronted merely with a consideration of documentary evidence on the subject.

At the trial in the Corporation Court both the prosecutrix and her mother fixed the date of her departure from home as Sunday, September 12. At the preliminary hearing the mother did not testify and the prosecutrix and her father fixed the date as September 7. It is impossible to say from the record which of the dates is correct.

The trial court in its opinion held that September 7 was fixed as the correct date of her disappearance by a teletype message dispatched on that date from the police department of the city of Norfolk with respect to the disappearance of the girl. But this is not necessarily so, because the evidence shows that she had left home on at least two other occasions, the dates of which were not fixed. She may have run away from home on both the 7th and 12th of September.

Furthermore, assuming that September 7 is the correct date of the girl's disappearance and the alleged attack, there is no showing that the prosecuting officers knew that her testimony in the Corporation Court fixing the date as the 12th was false. So far as the record shows they knew nothing of the teletype message relied on by the trial court.

In its written opinion the trial court says: "The petitioner claims that the shift in testimony was caused by the

fact that between the time of the preliminary hearing and the date of the trial, the Commonwealth ascertained that the accused was not in Norfolk on September 7, 1943, but in Ahoskie, N. C. The Commonwealth has given no explanation of the reason for the date-shifting, therefore the claim of the petitioner must be accepted as true."

We do not agree with this conclusion. The burden was on the petitioner to prove this serious charge which he made against the agencies of the Commonwealth, and not on them to disprove it. We find in the record no evidence that the prosecuting officers, the members of the police force, or any other agency of the Commonwealth knew that the petitioner was prepared to prove that he was not in Norfolk on September 7, and that the date of the alleged offense was "shifted" to avoid the petitioner's defense of alibi.

Ordinarily, in an offense of this character the date is immaterial. While, so far as the record shows, the prosecuting attorney was not aware that the girl had testified at the preliminary hearing that the offense had occurred on September 7, the petitioner who was present knew that she had. He, of course, knew that the indictment charged that it had occurred on the 13th, a different date. He heard the girl testify before the jury and fix the date as the 13th (after midnight of the 12th). That the petitioner then regarded the date as immaterial is indicated by the fact that she was not cross-examined as to this variance in her testimony given at the two hearings. At no time during the trial did the petitioner or his counsel claim or bring to the attention of the Corporation Court that the change of the date on which the offense was alleged to have occurred had the serious consequence of depriving him of the proof of an alibi.

These and perhaps other variances in the testimony of the prosecutrix, given at the two hearings, were matters affecting her credibility which should have been developed at the trial in the Corporation Court, in which the peti-

tioner's guilt or innocence was involved. But the showing in a *habeas corpus* proceeding of such inconsistencies in the testimony of the principal witness for the prosecution falls far short of sustaining the charge that the petitioner's conviction rests upon perjured or false testimony which the prosecuting officers of the State knowingly resorted to in order to bring about his conviction.

We are of opinion that the judgment complained of should be reversed and the petition for a writ of *habeas corpus* dismissed. It is so ordered.

*Reversed and final judgment.*