PRESENT:  All the Justices

In Re: Darnell Phillips

OPINION BY
CHIEF JUSTICE DONALD W. LEMONS
December 13, 2018

Record No. 171438

UPON A PETITION FOR A WRIT OF ACTUAL INNOCENCE

Upon consideration of the petition for a writ of actual innocence filed October 31, 2017,

the brief and supplemental authority in support of the petition, the respondent's motion to

dismiss, Phillips' reply to the motion to dismiss, the respondent's response, Phillips' motion for a

nonsuit, and the respondent's response to the motion, the Court is of the opinion the motion for a

nonsuit should be denied, the motion to dismiss should be granted, and the writ should not issue.

I.    Facts and Proceedings

Phillips challenges his 1991 convictions from the Circuit Court of the City of Virginia

Beach for abduction with intent to defile, rape, forcible sodomy, and malicious wounding.

Phillips' unsuccessful appeal to the Court of Appeals of Virginia concluded in 1993, and he did

not appeal to this Court.  Phillips filed his first petition for a writ of actual innocence in this

Court in 2004.  That petition was based on mitochondrial DNA testing conducted on a single hair

recovered from a sheet from the gurney on which Phillips' victim was transported to the hospital.

This Court dismissed that petition on January 13, 2005.  Phillips has now filed his second

petition for a writ of actual innocence, asserting recent DNA testing by a private laboratory,

Serological Research Institute ("SERI"), demonstrates by clear and convincing evidence that he

is actually innocent.

The record, including the trial transcript, demonstrates that on August 7, 1990, ten year-old M.C., who lived in Norfolk but was visiting her friend, Amy Gates, in the Timberlake neighborhood of Virginia Beach, decided to go for a bike ride shortly after 6:00 p.m. After M.C. had been riding for a while, she noticed a man, who she identified at trial as Phillips, sitting in a gazebo. The man was wearing a white T-Shirt with "42" emblazoned in green on it, grayish-white shorts, a brown leather belt, and a black, cotton rain hat with a Chicago Bulls emblem on it, and he had a gold tooth.

M.C. slipped while riding her bike on a footbridge, so she got off the bike and began walking it down a path. Phillips left the gazebo and began following her. When Phillips was directly behind her, M.C. offered to let him go ahead of her, but Phillips declined. M.C. offered to let Phillips go ahead of her a second time, and again he declined before pushing the child down an embankment running along a canal.

M.C. tried to climb the embankment back to the path, but the slope was too slippery. Phillips told her if she screamed he would kill her, then came down the embankment, sliding down the slope. Phillips took off the child's bicycle shorts and underwear and threw them behind her, into the water. Phillips unzipped his pants and exposed his penis, then digitally penetrated M.C.'s vagina multiple times. Phillips then orally sodomized M.C., forcing his penis into her mouth and telling her to "suck it," before raping her. M.C. described herself as "scared, frightened, confused," and semiconscious by this point in the encounter. When he was finished, Phillips punched M.C. in the face multiple times before tossing the semiconscious child in the canal.

M.C. revived, got her clothes out of the water, picked up her bike, and started running. She kept running until she encountered three girls, one of whom was Lori Bailes. Bailes testified

that M.C. was screaming, crying, shaking, and saying she wanted her mommy. M.C. was wearing only her shirt, socks, and tennis shoes. She was carrying her shorts, her hair was matted and wet, there were leaves and mud in her hair and on her face, and she was bleeding from one side of her face. One of the girls told M.C. to put her pants on, and M.C. complied. The girls then took M.C. to the home of Emily Logan. Logan wrapped the child in a flannel sheet or blanket and called 911.

M.C. described her assailant to Logan while Logan was on the phone with the emergency operator and Logan relayed the description. At trial, Logan recalled the description had been of a young black man wearing white shorts, a white shirt "with some kind of big letters or numbers" on it, and a black hat. The rescue squad, who received the call for assistance at about 7:12 p.m., arrived and took M.C. by ambulance to the hospital. Detective Steven Kurrle met the ambulance at the hospital and assisted in moving M.C. from the ambulance gurney to a hospital bed. He collected the gurney sheet, then spoke briefly with M.C. before she was examined and a physical evidence recovery kit ("PERK") and her clothing were collected from her. Afterwards, Kurrle spoke with M.C. again, and she described her assailant as a black male of heavy build, with a gold tooth on the left side of his mouth, wearing a black rain-type hat with a wide brim and a red emblem. She stated the assailant was either bald or had little hair on the top of his head and that the side of his head was shaved.

Detective Joel Davis was one of the officers who responded to a call from police dispatch to search the area where the rape occurred. He searched the neighborhood and found Phillips and Michael Norfleet. Norfleet was wearing a white T-shirt with Bart Simpson on it, shorts, and a baseball cap. Phillips was wearing a dark shirt and carrying a hat. Davis initially focused on Norfleet, based on the description of the assailant's clothing that M.C. had provided, but when he

3

got close to him, Davis realized Norfleet was "five or six years younger than the person" he was looking for. He spoke with Phillips and Norfleet, who told him they had "just come out of [Norfleet's] house from changing clothes." He told them he was investigating the rape of a young girl, gave them the description, and asked if they had seen anyone fitting that description. Phillips and Norfleet "immediately pointed [down the road] and said, He ran this way." Davis took off after the suspect, but, finding nothing, recalled the comment about changing clothes and, suspecting he had been tricked, turned around and went looking for Phillips and Norfleet.

Davis found Phillips and Norfleet and again asked for their help. He told them they might have seen the rapist and asked them to accompany him to see the detectives investigating the case. They agreed. Davis took them to see Detective Robert Manzione. Manzione spoke with Phillips and asked where he had been that day. Phillips told the detective he had been at Norfleet's house. Manzione noticed Phillips had a gold tooth on the upper left side of his mouth. Manzione took pictures of Phillips and Norfleet wearing their hats, and brought the photographs to the hospital, where they were shown to M.C. M.C. said "that's not him" when she looked at the picture of Norfleet. When she looked at the photograph of Phillips, she stated "That's the hat, but I'm not positive about the face."

Eventually, after further investigation, police obtained a search warrant for Phillips' person, located Phillips, and brought him into the police station. When officers found him, Phillips was wearing a black hat with a Chicago Bulls emblem on it. Detective Kurrle took a photograph of Phillips' face, without the hat. The photograph was placed in a photo array, which Detective Anthony Zucaro showed to M.C. while Detective Kurrle waited with Phillips. Phillips' photograph was number two in the array. M.C. said that number two and number six

4

resembled her assailant.  Zucaro also showed M.C. the hat, which she identified as the hat worn by her assailant.

Detective Zucaro reported the results to Kurrle, who told Phillips that his photograph had been picked as a possible suspect and that the victim had identified his hat.  Kurrle asked Phillips if he had any reason or knowledge why the victim would have picked his photograph.  Phillips responded that the "fat little girl" might have seen him in the park earlier that day.  Phillips, however, denied assaulting M.C.  Detective Zucaro also questioned Phillips, and Phillips again denied any involvement.  Detective S.W. Hoffman, who was only peripherally involved in the case and knew none of the details, then offered to talk to Phillips.  Detective Kurrle, who was the lead detective on the case, agreed.

Hoffman entered Phillips' interview room, sat down next to him, and introduced himself.  Phillips told the detective he was in the area of the park when the rape occurred and saw the victim and that was why she recognized him.  Hoffman told Phillips he thought Phillips was lying and that he believed Phillips had made a mistake.  Hoffman told Phillips that in court he could be "made out to be some type of monster that would have committed this type of crime," but Hoffman did not believe he was "that type of monster."  Hoffman reiterated that he believed Phillips had just made a mistake.  Phillips looked directly at Hoffman and Hoffman asked, "did you make a mistake; was this just a mistake?"  Phillips nodded and then, at Hoffman's request for a verbal response, said "yes."  Hoffman asked Phillips if he "really intended to hurt the young girl," to which Phillips said "no."  Hoffman asked Phillips whether "he would ever do anything like this again," and Phillips said he would not.  Hoffman told Phillips he "would try to help him in any way I could and that we would need to go through the whole story; he would need to tell me exactly what happened."  Phillips began to cry and said if he told Hoffman what happened,

Hoffman "would think he was an animal." Hoffman told Phillips he "would not think he was an animal and that I believed he just made a mistake and to go ahead and tell me." Phillips did, describing how he knocked M.C. off her bicycle, "dragged her approximately ten feet into the woods," beat her with his fist, raped and sodomized her, and discarded her in the water.

Phillips claimed he initially thought M.C. was fifteen or sixteen and that it was not until after he knocked her down that he realized how young she was. He recalled "striking [M.C.] in the face seven or eight times as hard as he could" with his fist and said he did it because she "was trying to fight me." Phillips described how he had torn M.C.'s pants and panties off and raped her. He told Hoffman he had not ejaculated during the rape. He described M.C.'s pants as "a dark color" and her underwear as "a light color." Phillips described orally sodomizing M.C., telling Hoffman he "took [M.C.] by the back of the head and forced her head onto his penis, and that he "made her move her mouth up and down on his penis for several seconds." Phillips again denied ejaculating. Phillips told Hoffman that, after he was done with M.C., he pushed her into a lake and "took off running." He described M.C. as a white female, ten years old, with brown, shoulder-length hair. Hoffman asked about the underwear Phillips had been wearing, and Phillips said he had washed them out and put them in the clothes hamper at home. In a subsequent search of Phillips' home, police found the still wet underwear balled up in the hamper, with a "maroon or brownish" stain on the front. Before concluding the interview, Hoffman asked Phillips "what reason he could give me" for attacking M.C. When Phillips could not give an answer, Hoffman asked "was this just an urge that came over you?" Phillips said "yes."

At trial, Phillips denied having confessed to the crimes and attempted to present an alibi. However, Phillips' witnesses provided inconsistent testimony. Phillips, Norfleet, and Kevin

6

Graves, for example, claimed they were together for most of the day, beginning early in the afternoon. However, Phillips' mother testified he was with her all day and only went out that evening, purportedly to return a bicycle he had borrowed. According to Markel Santiago and Bobby Casson, Phillips, Norfleet, and Graves dropped by Casson's house that evening. Phillips and Norfleet stayed for about 45 minutes to an hour, leaving just a few minutes before Casson's mother arrived home at 6:45. However, Amy Gates testified M.C. left her house to go on her bike ride around 5:45, and Santiago, who was her neighbor, arrived a few minutes later, staying and listening to music until Gates realized M.C. had been gone too long. Gates testified Santiago even went outside with her to look for the missing child. Santiago denied this. Santiago also claimed Phillips and Norfleet had visited him earlier in the day to borrow a bicycle, but Phillips claimed he had borrowed the bicycle the previous evening and both Phillips and Norfleet testified they had been at Norfleet's house until they went to return the bicycle that evening. Further, Graves testified none of them had a bicycle that day and that they had not returned any bicycle before going to Casson's house.

Phillips also attempted to show he had been wearing a brown and black shirt all day. Several of Phillips' witnesses, including his mother, testified he had been wearing a black and brown shirt. Further, Phillips and Norfleet testified that only Norfleet had changed clothes before the encounter with Detective Davis, and that he had done so because he had slipped in the mud. Santiago, however, testified Norfleet had been wearing a Bart Simpson shirt all day. A jury rejected Phillips' evidence and convicted him of abduction with intent to defile, rape, forcible sodomy, and malicious wounding and sentenced him to 100 years' imprisonment.

In December 2015, after Phillips had exhausted his appeal and other post-conviction remedies, Phillips filed a motion for scientific analysis of previously untested biological

7

evidence. Phillips sought DNA testing of several pieces of evidence that remained in the circuit court's file, including M.C.'s clothing and PERK. Following a hearing on the motion, the circuit court entered an agreed order to have the Virginia Department of Forensic Science ("DFS") test the physical evidence remaining in the court's file. DFS tested several swabs from the PERK, but found no spermatozoa and no DNA profile foreign to the victim. DFS also tested the gurney sheet and found no seminal fluid and no DNA foreign to the victim.

Over the Commonwealth's objection, the circuit court subsequently ordered the evidence transmitted to Forensic Analytic Sciences ("FAS"), a private laboratory, for additional testing. FAS tested several swabs from the PERK, the sheet, a tissue, and clothing. FAS found no sperm cells or male DNA. The circuit court, again over the Commonwealth's objection, ordered the evidence transmitted to SERI for additional DNA testing. SERI conducted several tests that did not yield significant results. However, SERI used an M-Vac, a wet vacuum DNA collection tool, to collect trace, or touch, evidence from the victim's clothing. Phillips acknowledges this collection method is not available at DFS. SERI analyzed the trace evidence and developed a "weak and incomplete" DNA profile from the material extracted from the interior of the victim's underwear. SERI concluded Phillips was a possible contributor to this DNA profile. DNA collected from the exterior of the garment, SERI determined, came from multiple people, but Phillips was excluded as a possible contributor. DNA collected from the exterior of the victim's shorts contained a mixture of DNA from at least two males, and Phillips was excluded as a possible contributor. SERI reported these results on August 31, 2017. This testing and the resulting report submitted by SERI's forensic scientist form the basis for Phillips' current petition for a writ of actual innocence.

8

After Phillips filed his petition for a writ of actual innocence, the Court decided *In re: Brown*, 295 Va. 202, 225 (2018). Recognizing the holding in *Brown* is not favorable to him, Phillips has moved to nonsuit his petition, to which motion the respondent objects.

## II. Analysis

### A. Nonsuit

Virginia's nonsuit statute, Code § 8.01-380, is located in title 8.01, which is entitled "Civil Remedies and Procedure." This statute allows a party to take one nonsuit, as a matter of right, "as to any cause of action or claim," as long as the party does so "before a motion to strike . . . or before the jury retires from the bar or before the action has been submitted to the court for decision." Code § 8.01-380. This Court has described this statute as one of "general application for all civil cases." *Daniels v. Warden*, 266 Va. 399, 402 (2003). In order to determine whether Phillips is entitled to a nonsuit, this Court must first determine whether a petition for actual innocence is a civil "cause of action or claim" to which the nonsuit statute would be applicable. We hold that it is not.

As this Court noted in *Brown*, there is no common-law authority to grant pardons. 295 Va. at 208. The "traditional remedy for claims of innocence based on new evidence, discovered too late in the day to file a new trial motion, has been executive clemency." *Id.* (citing *Herrera v. Collins*, 506 U.S. 390, 417 (1993)). In 2002, however, the Constitution of Virginia was amended to give this Court "original jurisdiction . . . to consider claims of actual innocence presented by convicted felons in such cases and in such manner as may be provided by the General Assembly." Va. Const. art. VI, § 1. The General Assembly set forth the "cases" and "manner" in which this Court may consider claims for actual innocence in Chapter 19.2 (Issuance of Writ of Actual Innocence) of Title 19.2 (Criminal Procedure). Chapter 19.3 of the

9

same Title 19.2 governs writs of actual innocence based on nonbiological evidence, which are first considered in the Court of Appeals and may be appealed to this Court. Significantly, Title 19.2 governs criminal procedure.

While not dispositive, the location of the actual innocence statutes within Title 19.2 indicates that proceedings concerning an actual innocence petition are criminal in nature. The United States Supreme Court has recognized the location of a statute as an appropriate factor to consider when determining whether a particular proceeding is civil or criminal:

> The categorization of a particular proceeding as civil or criminal is first of all a question of statutory construction. We must initially ascertain whether the legislature meant the statute to establish civil proceedings. If so, we ordinarily defer to the legislature's stated intent. Here, Kansas' objective to create a civil proceeding is evidenced by its placement of the [Sexually Violent Predator] Act within the Kansas probate code, instead of the criminal code, as well as its description of the Act as creating a civil commitment procedure. Nothing on the face of the statute suggests that the legislature sought to create anything other than a civil commitment scheme designed to protect the public from harm.

*Kansas v. Hendricks*, 521 U.S. 346, 361 (1997) (internal quotation marks and citations omitted). Similarly, in *Shivaee v. Commonwealth*, 270 Va. 112 (2005), this Court considered whether Virginia's Sexually Violent Predators Act ("SVPA") was criminal or civil. Relying on the decision in *Hendricks*, this Court held that the SVPA was civil. In reaching its conclusion, one of the factors the Court considered was the location of the SVPA within the Code of Virginia. The Court explained:

> The SVPA was codified by the General Assembly as a civil statute, as indicated by its placement in Title 37. Nothing in the SVPA "suggests that the legislature sought to create anything other than a civil commitment scheme designed to protect the public from harm."

*Id.* at 125.

Again, several years later, this Court looked to the location of a particular statute within the Code as a factor to consider when determining the General Assembly's intent. In *Kiser v.*

10

*A.W. Chesterton Co.*, 285 Va. 12 (2013), this Court was considering a certified question regarding the accrual of an injured person's cause of action for damages due to latent mesothelioma. In determining that the statute in question created only a discovery accrual rule for asbestos exposure actions and did not abrogate the common law indivisible cause of action principle, the first factor the Court considered was the statute's "location in the Code." *Id.* at 27. The Court held:

> In amending Code § 8.01-249 throughout the years, the General Assembly has reaffirmed through the amendments' enactment clauses what is evident from the statute's plain language and *location in the Code*: that the provision deals only with the accrual of causes of action and does not create the causes of action.

*Id*. (emphasis added). This Court's opinions, as well as the United States Supreme Court's decision in *Hendricks*, make clear that the location of the actual innocence statutes within Title 19.2. is a significant factor indicating the General Assembly intended these proceedings to be criminal in nature.

The development of the actual innocence statutes also indicates that the proceedings it authorizes are criminal in nature. The actual innocence statutes were created as an exception to Virginia's 21-day finality rule. *See* Virginia State Crime Comm'n, Writ of Actual Innocence Based on Non-Biological Evidence, Report Doc. 52*,* at 6 (2004), *available at* https://rga.lis.virginia.gov/Published/2005/RD52/PDF (last visited Nov. 28, 2018). In Virginia, after a final order is entered in a criminal trial, a defendant has 21 days to bring new evidence of innocence to the trial court. A defendant seeking a new trial within that 21-day window must prove four factors: the new evidence (i) was discovered after the trial, (ii) could not, with due diligence, have been discovered before the trial concluded, (iii) is "material, and such as ought to produce a different result," and (iv) is not "cumulative, corroborative or collateral." *Pauley v. Commonwealth*, 151 Va. 510, 518-19 (1928).

11

Prior to 2001, if new evidence of innocence came to light after expiration of the 21 days, the only remedy was to petition for executive clemency. *See Brown*, 295 Va. at. 208-09. In 2001, the first exception to the 21-day rule was created when the General Assembly crafted a procedure to allow a convicted felon to petition the circuit court where he was convicted to order scientific testing of biological evidence and to then file a petition with this Court for a writ of actual innocence based upon biological evidence. A few years later, the second exception was created when the General Assembly passed legislation to permit petitions for writs of actual innocence based on non-biological evidence. The actual innocence statutes incorporated the principles of the four-part test that already governed defendants' motions for a new trial based on newly-discovered evidence when that motion was made within the 21-day window of time. *See* Code §§ 19.2-327.3(A), -327.5, -327.11(A), and -327.13 (stating burden of petitioner seeking writ of actual innocence).

Further, unlike writs of habeas corpus or motions to vacate criminal judgments, writs of actual innocence are not collateral attacks on the underlying convictions. *See Smyth v. Godwin*, 188 Va. 753, 760 (1949) (acknowledging as settled principle that "habeas corpus is a civil and not a criminal proceeding" that is "designed to challenge the civil right of the validity of the petitioner's detention."); *Virginia Dept. Corr. v. Crowley*, 227 Va. 254, 262-63 (1984) (a motion to vacate, like a habeas corpus petition, is civil in nature, as it tests the legality of the detention, rather than the petitioner's guilt or innocence). These writs do not challenge the constitutionality of the defendant's detention or trial. Rather, they were created to allow for the consideration of new evidence relevant to the defendant's guilt outside of the 21-day window, but borrowing from the same test that governs claims of newly discovered evidence which are made within the

21-day period after entry of final judgment. Accordingly, the legislative history and purpose of the actual innocence statutes demonstrates they are meant to be criminal in nature.

Another factor relevant to whether a proceeding is civil or criminal is the burden of proof that must be met in the proceeding. This Court has explained that, as a general rule, the burden of proof in civil matters is "by a preponderance of evidence." *RF&P Corp. v. Little*, 247 Va. 309, 318 (1994). The requirement of proof by "clear and convincing evidence generally is limited to certain cases that are equitable in nature, such as suits involving fraud and misrepresentation, undue influence, estoppel, and requests for the imposition of . . . trusts." *Id.* The reasonable doubt standard is a purely criminal construct which has long been acknowledged "in common law jurisdictions as the measure of persuasion by which the prosecution must convince the trier of all the essential elements of guilt." *In re: Winship*, 397 U.S. 358, 361 (1970).

The burden of proof imposed in actual innocence proceedings is a hybrid. Petitioners are required to prove, by clear and convincing evidence, that no rational factfinder would have found proof of guilt beyond a reasonable doubt. *See* Code §§ 19.2-327.3(A)(vii), -327.5(A)(vii), and -327.13. The Crime Commission explained in its 2004 Report that a reviewing court would have to read the "no rational trier of fact" standard into the requisite burden of proof of clear and convincing evidence, and that this burden of proof was "so high a spurious claim would not survive summary dismissal – much less merit relief under the Writ." Virginia State Crime Comm'n, Report Doc. 52*, supra*, at 16. Additionally, this Court has discussed the high burden of proof a petitioner in actual innocence proceedings must fulfil:

> [W]e are required to look beyond whether the evidence is
> sufficient to sustain the conviction; we must also examine the
> likelihood of a reasonable juror finding the petitioner guilty
> beyond a reasonable doubt once all of the evidence has been fairly

13

considered. This probabilistic approach still places a considerable burden upon the petitioner. It is not enough for a petitioner to merely establish the existence of some conflicting evidence that introduces the possibility of reasonable doubt. Rather, the petitioner must prove, by clear and convincing evidence, that *no* rational trier of fact would have found proof of guilt beyond a reasonable doubt. In other words, a petitioner's evidence must do more than establish the theoretical possibility that a rational fact finder would choose to acquit; it must establish such a high probability of acquittal, that this Court is reasonably certain that no rational fact finder would have found him guilty.

*In re: Watford*, 295 Va. 114, 124 (2018). That the General Assembly incorporated the reasonable doubt standard into the burden of proof is another indication actual innocence proceedings are criminal as opposed to civil.

Considering the actual innocence statutes were placed in the Code title governing criminal procedure, the legislative history of these statutes indicating they were created as an exception to the 21-day rule, and that the burden of proof incorporates in part the same high burden used in criminal proceedings, it is clear that the General Assembly intended that a petition for a writ of actual innocence be deemed a proceeding that is criminal in nature, as opposed to one that is civil. Accordingly, we hold that Phillips' petition is not a civil action to which the nonsuit statute applies, and his motion for a nonsuit must be denied.

B. The Statutory Necessity for DFS Test Results

This Court's authority to grant a writ of actual innocence based on biological evidence is governed by Code §§ 19.2-327.3 and -327.5. Code § 19.2-327.3 sets forth the requirements for a petition for a writ of actual innocence, and requires the petitioner to state:

(A)(i) the crime for which the petitioner was convicted . . . and that such conviction . . . was upon a plea of not guilty or that the person is under a sentence of death or convicted of (a) a Class 1 felony, (b) a Class 2 felony, or (c) any felony for which the maximum penalty is imprisonment for life; (ii) that the petitioner is actually innocent . . . ; (iii) an exact description of the human biological evidence and the scientific testing supporting the allegation of

14

innocence; (iv) that the evidence was not previously known or available to the petitioner or his trial attorney of record at the time the conviction . . . became final in the circuit court, or if known, the reason that the evidence was not subject to the scientific testing set forth in the petition; (v) the date the test results under § 19.2-327.1 became known to the petitioner or any attorney of record; (vi) that the petitioner or his attorney of record has filed the petition within 60 days of obtaining the test results under § 19.2-327.1; (vii) the reason or reasons the evidence will prove that no rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt.

Pursuant to Code § 19.2-327.5, this Court must either dismiss a petition for a writ of actual innocence "for failure to state a claim or assert grounds upon which relief shall be granted," or, if the petition is procedurally sufficient, hear oral argument on the matter before dismissing the petition for lack of merit or granting the writ "upon a finding of clear and convincing evidence that the petitioner has proven all of the allegations contained in clauses (iv) through (viii) of subsection A of § 19.2-327.3" and that "no rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt." We hold that Phillips' petition fails to state a claim and must therefore be dismissed without argument.

This Court's authority to grant a writ of actual innocence based on biological evidence is limited. *See* Va. Const. art. VI, § 1 (vesting this Court with "original jurisdiction . . . to consider claims of actual innocence presented by convicted felons in *such cases* and in *such manner* as may be provided by the General Assembly") (emphases added); Code §§ 19.2-327.2 through -327.6 (providing the cases and the manner in which this Court may grant such writs). This limited authority allows the Court to issue a writ of actual innocence based on certified DFS test results. The Court does not have the authority to issue a writ of actual innocence based on the results of tests not performed or certified by DFS. *Brown*, 295 Va. at 225-26.

Phillips' petition does not rely upon test results provided by DFS to support his claim of actual innocence. Phillips instead relies on the results of tests conducted by SERI, upon which

15

this Court has no authority to issue a writ of actual innocence. *Id.* Consequently, the petition must be dismissed for failure to state a claim. Code § 19.2-327.5.

### III. Conclusion

For the reasons stated, the writ of actual innocence will not issue, the motion for nonsuit will be denied, and the petition will be dismissed.

*Dismissed.*